UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JEFFREY WEBER,

                    Defendant.

No. 18-cr-641 (RJS)

ORDER

RICHARD J. SULLIVAN, Circuit Judge:

The Court is in receipt of a letter from Jeffrey Weber, incarcerated and proceeding pro se, moving for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The Court attaches herewith a redacted form of the motion, as well as three of the seven exhibits the Court received with the motion. The Court does not attach Exhibits A, B, C, and F. In light of the references to Defendant's birthdate, his private health information, and his mother's personal identifying information in the redacted portions of the motion and in those exhibits, the Court concludes that the presumption in favor of open records has been outweighed by Defendant's privacy interests. *See United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995). Accordingly, IT IS HEREBY ORDERED THAT an unredacted motion and Exhibits A, B, C, and F be filed under seal.

Additionally, because the Court has determined that the motion should not be summarily denied, IT IS FURTHER ORDERED THAT the government shall file a response to Defendant's motion no later than September 8, 2023. The Clerk of Court is respectfully directed to electronically notify the Criminal Division of the U.S. Attorney's Office for the Southern District of New York that this Order has been issued and to mail a copy of this Order to Jeffrey Weber,

Reg. No. 85377-054, FCI Fort Dix, Federal Correctional Institution, P.O. Box 2000, Joint Base

MDL, NJ 08640.

SO ORDERED.

Dated:      August 18, 2023
              New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JEFFREY WEBER,

    Defendant.

Case No. 18-CR-641

---

## MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A) AND MEMORANDUM IN SUPPORT

COMES NOW, Defendant Jeffrey Weber ("Weber" or "Defendant" hereinafter), pro se, moving for modification of his 120 month sentence under 18 U.S.C. § 3582(c)(1)(A) for extraordinary and compelling reasons warranting which outlined in the following memorandum.

I.    PROCEDURAL HISTORY

On May 28, 2019 the Court imposed a 120 month term of imprisonment with five years of supervised release to follow arising from Weber's guilty plea to his conduct that involved answering a Craigslist Personal Ad posted by an undercover law enforcement officer posing as a thirteen year old female. Two weeks of correspondence with said officer subsequently resulting in an attempted in-person meet from which one count charging Attempted Enticement of a Minor in violation of 18 U.S.C. § 2422(B) arose.

1

On August 27, 2019 Weber was committed to custody of
the Bureau of Prisons (BOP) - designated to Fort Dix Federal
Correctional Institution (FCI) in Burlington County, New
Jersey - his release from where projected for September 19,
2025 presently via First Step Act (FSA) credits applied. see
Exhibit [EX.] A

II.    APPLICABLE AUTHORITY

District court's are generally without authority to
modify terms of imprisonment once imposed save for a "few
narrow exceptions" set forth expressly by statute. Freeman
v. United States, 564 U.S. 522, 526 (2011); see also United
States v. Gotti, 433 F.Supp. 3d 613, 614, No. 02-CR-743,
2020 U.S. Dist. LEXIS 8612, 2020 WL 497987, at *1 (S.D.N.Y.
Jan. 15, 2020).

Providing one such exception 18 U.S.C. § 3582(c)(1)(A)
as amended by the First Step Act of 2018 see Pub.L. No. 115-
391, §603(b), 132 Stat. 5194, 5239 (2018) empowers a Courts
modification of a Defendant's sentence upon motion, after:

[a]    fully exhausting all administrative rights to
       appeal a failure of the Bureau of Prisons to
       bring a motion on the defendant's behalf, or;

[b]    lapse of 30 days from receipt of such request
       by the Warden of the defendant's facility -
       whichever is earlier. see 18 U.S.C. §
       3582(c)(1)(A)(i); see also United States v.
       Scparta, 2020 U.S. Dist. LEXIS 68935, 2020 WL
       1910481, at *4 (S.D.N.Y.2020).

Upon satisfactory administrative remedy exhaustion, a
District Court may then reduce the term of imprisonment (and
may impose a term of probation or supervised release with or
without conditions that does not exceed the unserved portion

of the original term of imprisonment) after finding:

> [1]  "extraordinary and compelling" circumstances present in the case warranting reduction;
>
> [2]  the reduction "consistent with applicable policy statements issued by the Sentencing Commission," and;
>
> [3]  the reduced sentence "supported by factors set forth in 18 U.S.C. § 3553(a)." United States v. Canales, No.16-CR-0212, 2020 U.S. Dist. LEXIS 82035, 2020 WL 2319294, at * 2 (S.D.N.Y. May 9, 2020)

And to the extent "applicable policy statements" by the Sentencing Commission are considered, since FSA passage the district court is "not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons or by its freestanding requirement that the defendant seeking release not pose any danger to the community." United States v. Ciprian, No.11-CR-1032, 2021 U.S. Dist. LEXIS 18698, at *5 (S.D.N.Y. Feb. 1, 2021).

Until updating its' guidance following passage of the First Step Act, hence, there is no "applicable" policy statement governing defendant filed compassionate release motions under the FSA's amended § 3582(c)(1)(A) in which case district court's are "empowered... to consider any extraordinary and compelling reason for release that a defendant might raise." United States v. Zullo, 976 F.3d 228, 230 (2d Cir.2020).

Moreover, the defendant petitioning for reduced sentence assumes burden of demonstrating such to be warranted by a preponderance of the evidence; rehabilitation

3

alone insufficient as grounds for sentence reduction. see United States v. Flores, No.17-CR-449, 2020 WL 2907549, at *2 (S.D.N.Y. June 3, 2020); see also 28 U.S.C. § 994(t).

III.    CONCLUSION(S) OF LAW & FACT

Weber suffers from chronic medical conditions that include: hypertension, coronary artery disease, heart failure, polycythemia, and obstructive lung disease which are poorly controlled and managed by the B.O.P. These conditions, combined with Weber's sixty-four years of age and severely high Body Mass Index (BMI) expose him to severe outcome once infected with COVID-19 and constitute "extraordinary and compelling" circumstances warranting his modified sentence when considering only twenty-four months remaining (at most) until his release.

A.    OVER THIRTY-DAYS ELAPSING FROM WEBER'S
      WARDEN-SUBMITTED REQUEST FOR REDUCED SENTENCE
      WITH NO RESPONSE RENDER ADMINISTRATIVE EXHAUSTION
      SATISFIED

The Administrative Exhaustion requirement 18 U.S.C. § 3582(c)(1)(A) sets forth is "unambiguous" thus strictly enforced regardless of COVID-19's presence - Weber complying, accordingly. United States v. Samuels, No.08-CR-789-6(RJS), 2020 WL 769004, at *2 (S.D.N.Y. Dec 28, 2020); see also United States v. Smith, No.8:17-CR-412-T-36, 2020 U.S. Dist. LEXIS 85856, 2020 WL 2512883, at *4 (M.D.Fla., May 15, 2020)(Court "does not have the authority to excuse the exhaustion or lapse requirement in § 3582(c)(1)(A), even in the midst of the COVID-19 pandemic.").

4

On June 21, 2023 Weber submitted the "COMPASSIONATE
RELEASE/REDUCTION IN SENTENCE" entitled form Ex. B to Case
Manager Boyd (per local procedure) to be forwarded to the
Warden. For good measure, additionally, Weber submitted a
Warden-addressed "Electronic Request To Staff" on June 21,
2023 as well also requesting compassionate release. Ex. B-2

As of this filing Weber has "waited 30 days from the
Warden's receipt of his request for compassionate release
without receiving a response" in which case rendering
administrative exhaustion satisfied pursuant to §
3582(c)(1)(A)(i). Samuels, 2020 U.S. Dist. LEXIS 242852,
2020 WL 7696004, at *3; see also United States v. Genovese,
No.18-CR-0183, 2020 U.S. Dist. LEXIS 125095, 2020 WL
4004164, at *2 (S.D.N.Y. July 15, 2020).

B.  **WEBER'S CHRONIC UNCONTROLLED HEALTH CONDITIONS
    THAT INFECTION WITH COVID-19 COULD CRITICALLY
    WORSEN IS 'EXTRAORDINARY & COMPELLING REASON TO MODIFY
    HIS SENTENCE**

Weber suffers a variety of chronic conditions (next to
his weight and age) that an infection with COVID-19 could
critically exacerbate. But of course, "the mere existence of
COVID-19 in society" United States v. Raia, 954 F.3d 594,
597 (3d Cir.2020) and general fear of contracting it are
insufficient alone to show compassionate release as
warranted. Court's, instead, finding extraordinary and
compelling reasons warranting relief upon an inmate
"show[ing] both a [1] particularized susceptibility to the
disease and a [2] particularized risk of contracting the

5

disease at his prison facility.'" United States v. Blevins,
No.20-7053, 2020 U.S. App. LEXIS 40891, 2020 WL 7691726, at
*1 (4th Cir. Dec. 28, 2020)(quoting United States v.
Feiling, 453 F.Supp. 3d 832, 841 (E.D.VA.,2020)).

Ever since availability of highly effective vaccines,
however, "proving a particularized susceptibility to a
severe case of COVID-19 in a post-vaccination world requires
more than it did in a pre-vaccination world." United States
v. Moore, 2022 U.S. Dist. LEXIS 25953, 2022 WL 453536, at *5
(S.D.W.Va., Feb. 14, 2022)(collecting cases) Courts
therefore now employing a "rebuttable presumption" that the
risk of a severe COVID-19 outcome is not "extraordinary and
compelling" reason warranting relief that a defendant rebuts
by "offering evidence of an elevated personal risk of severe
harm despite the protections of vaccination." United States
v. Mathews, 2021 U.S. Dist. LEXIS 165219, at *9 (E.D.Cal.,
Aug 30, 2021).

Accordingly, Weber demonstrates his [1] own
susceptibility to severe infection with COVID-19, [2] the
above-average probability FCI Fort Dix exposes him to
contracting COVID-19, and of course, [3] his elevated risk
of severe harm persisting in spite of vaccination all via
"judicially noticeable information" published by public
health authorities, expert opinions, and scientific studies"
id., including Centers For Disease Control and Prevention
(CDC) guidance Courts rely on in determination of
"extraordinary and compelling" circumstances existing. see

6

e.g., United States v. Lagan, No.1:18-CR-0283(LEK), 2020
U.S. Dist. LEXIS 86330, at *8 (N.D.N.Y. May 11, 2020)(Courts
"base[] their resolution of compassionate release requests
in the COVID-19 era on whether the inmate-movant ha[s] an
underlying medical condition that place[s] her or him at
risk of developing a severe case of the illness." In making
such a determination "numerous courts have looked to
guidelines issued by the Centers for Disease Control and
Prevention ("CDC") as to what conditions place an individual
at higher risk for severe illness.")(citation and internal
quotation marks omitted)

[1] WEBER'S PARTICULARIZED SUSCEPTIBILITY

Attached medical documentation reflect Weber is a 64
year old white male weighing in at 260 lbs with a BMI of
39.0-39.9 who suffers from health conditions which include,
inter alia:

1. Heart Failure
2. Coronary Artery Disease
3. Hypertension
4. Polycythemia
5. Moderate Obstructive Lung Disease; see Ex. C

Of Weber's underlying conditions: heart failure,
coronary artery disease, and hypertension subject him to a
bona fide risk of severe (and/or fatal) infection with
COVID-19 out the gate; ("Having any of the following serious
heart conditions increase your risk of severe illness from
COVID-19: Heart failure; coronary artery disease;
cardiomyopathies; pulmonary hypertension.") People With
Certain Medical Conditions and Other Cardiovascular and

7

Cerebrovascular Disease,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#heart-conditions. see also United States v. Wiley, 487 F.Supp. 3d 782, 788 (D.Neb., Sept 17, 2020)("One study finding that 54.5% of hospitalized COVID-19 patients with a history of cardiovascular disease showed elevated levels of troponin, a biomarker associated with acute heart damage. The death rate among these hospitalized patients... was nonetheless 69.44%. By contrast, only 13.2% of hospitalized patients without previous cardiovascular disease showed elevated troponin levels, and among those patients the death rate was 37.5%, nearly half the rate of those with previous cardiovascular disease.")(citing Paolo Zamboni, COVID-19 as a Vascular Disease: Lessons Learned from Imaging and Blood Biomarkers, Diagnostics (June 29, 2020), https://www.mdpi.com/2075-4418/10/7/440.htm).

All the more concerning, Weber suffers from untreated polycythemia - a rare "slow growing blood cancer in which the bone marrow makes too many red blood cells. These excess cells thicken[ing] blood, slowing its flow... also caus[ing] complications, such as blood clots, which can lead to a heart attack or stroke." Higgins v. Saul, No.18-01077, 2019 U.S. Dist. LEXIS 219628, 2019 WL 7116356, at *1 n.2 (W.D.Ark. Dec. 23, 2019) also subjecting him to severe COVID-19 on account of cancer itself the CDC notes as an at-risk factor. see e.g., United States v. Proctor, 2021 U.S.

Dist. LEXIS 136724, at *7 (C.D.Ill., July 22, 2021)("Defendant's polycythemia vera, however, does place him at an increased risk of serious illness or death from COVID-19. The CDC has taken the position that cancer patients are at an increased risk of death and serious illness from COVID-19.")(citing People with Certain Medical Conditions, CDC).

Next to the foregoing is worsening mild obstructive lung disease Weber suffers followed by his obesity based on a BMI of 39.0-39.9 Kg/m2 (falling just short of "severe" at 40 Kg/m2 or higher) and 64 years of age - each considered in isolation also rendering him uniquely susceptible to a severe/fatal bout of COVID-19. That is, without even considering these seven (7) individual at-risk-factors comprising an eighth; being that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases.") Ctr's for Disease Control, People with Certain Medical Conditions. see accord United States v. Gonzalez, 2021 U.S. Dist. LEXIS 2105 (S.D.Cal., Jan 4, 2021)("Studies have found that obesity is one of the most common comorbidities among those who are hospitalized due to COVID-19, and that people who are obese are at higher risk of hospitalization, ICU admission, and death from COVID-19.")(citation omitted); United States v. Braccia, 2021 U.S. Dist. LEXIS 18310 (E.D.Pa., Feb 1, 2021)("The CDC has published statistics showing that COVID-19 infected persons in the 50-64-year-

9

old age bracket are four more times likely to die than those in the 18-29-year-old comparison group.").

[2] PRISON-ENVIRONMENT SUSCEPTIBILITY

Weber's risk of severe or fatal infection with COVID-19 increased by his age, weight, and numerous pre-existing conditions is magnified even greater by his confinement at FCI Fort Dix.

While prisons, jails, and the like generally do pose those inside increased threat of contracting COVID-19 and experiencing breakthrough infection (despite vaccination), to be sure - conditions of confinement where Weber is housed that enables higher transmission contribute further to an extraordinary and compelling finding. see e.g., United States v. Ortega, 2022 U.S. Dist. LEXIS 154256, at *7 (S.D.N.Y. Aug 26, 2022)("Moreover, vaccinated incarcerated individuals generally face a higher risk of contracting COVID-19 than vaccinated non-incarcerated individuals."); see also Covid-19's Impact on People in Prison, Equal Justice Initiative, https://eji.org/news/covid-19s-impact-on-people-in-prison/ (reporting American Medical Association findings that incarcerated people are infected by COVID-19 at a rate more than five times than the nation's overall).

Unlike any of the B.O.P's other low security institutions FCI Fort Dix houses too many people - upwards of 4,000 inmates rendering it an exceptional "powder keg for infection" beyond what is usual among other facilities. United States v. Skelos, 2020 U.S. Dist. LEXIS 64639, 2020

10

WL 1847558, at *1 (S.D.N.Y. Apr 12, 2020) And besides sheer size of its' inmate population is its layout rendering it even more vulnerable to high-transmission; housing inmates in non-air conditioned/poorly ventilated three-story dilapidated former Army barracks retrofitted now to house around 370 inmates in predominantly twelve-man rooms - stacked one above another on bunks beds. see Ex. D, ¶. 23-25.

It is a given, indeed, that in light of the "shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of reinfection and the spread of infection within prisons and detention facilities is particularly high" United States v. Taylor, 2021 U.S. Dist. LEXIS 13817 (D.Md.,2020)(citing Coreas v. Bounds, 451 F.Supp. 3d 407, 413 (D.Md.,2020)(citing expert opinions)) Fort Dix though, truly embodies these concerns as Dr. Goldenson's Declaration corroborates.

The institutions three-story open layout precludes standard quarantine/isolation protocols, for instance. Ex. D, at ¶. 44 & 46 There are no cells, and housing nearly 400 inmates once one person tests positive everyone else has long since been exposed/infected - and to what extent the facility might consider itself to observe isolation/quarantine protocols; inmates confirmed positive removed are joined by a stream of other positive-inmates thereby ensuring fresh contamination at all times to those

11

present first. see Ex. D, ¶. 44, 46.

Once a confirmed case is found in a dorm, otherwise, not only is there no recourse but to allow it run its course - inmates who might happen to be quarantined/isolated are exposed to infection via every new inmate subsequently entering "quarantine". And of course, with such an unusually high number of inmates present comes the corresponding higher volume of staff entering and exiting the prison. This unavoidable constant in-and-out of staff assuring steady introduction of the newest COVID-19 variant to the confined inmate population. Ex. D, at ¶.25; see also United States v. Howard, 2020 U.S. Dist. LEXIS 149947 (E.D.Mich., Aug 19, 2020)(noting how "staff come to work and go home from facilities and, like the rest of free society, some may choose not to abide by proper social distancing... recognizing that the BOP has implemented procedures to limit the spread of COVID, but certain risks simply cannot be avoided, particularly those associated with the rotating inflow of staff..."); United States v. Campagna, No.16-CR-78, 2020 U.S. Dist LEXIS 54401, 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020)(granting compassionate release noting how "staff at the facilities leave and return daily, without screening" and "residents... sleep in bunk beds in close proximity,...").

Besides Fort Dix's layout and inability to meaningfully quarantine/isolate infected inmates itself constituting extraordinary and compelling circumstance itself; a

12

facilities history of previous outbreaks is an additional
consideration courts weigh in determining a defendant's
place of incarceration posing him or her an elevated risk of
catching the virus. see e.g., <u>Mathews</u>, 2021 U.S. Dist. LEXIS
165219, at *21 (finding that "a large number of individuals
having contracted the virus" demonstrates a defendant's
facility to be "at risk of an outbreak" short of "currently
suffering from a[n] [active] COVID-19 outbreak..."); <u>United
States v. Huntington</u>, No.19-133, 2020 U.S. Dist. LEXIS
242610, at *7 (D.N.J. Dec 28, 2020)(finding the court "also
considers the likelihood of the defendant contracting COVID-
19 at the institution in which he is incarcerated" for the
extraordinary and compelling circumstance inquiry).

     Indeed, it is not surprising (all things considered)
that Fort Dix is known as the "epicenter of the virus in the
federal prison system." Joe Atmonavage, 'Absolute chaos and
terrifying.' The Coronoavirus is running rampant through
N.J. prison again, https://www.nj.com/news/2021/01/absolute-
chaos-and-terrifying-the-coronavirus-is-running-rampant-
through-nj-prison-again.html.

     Twelve New Jersey lawmakers including U.S. Senators
Robert Menedez and Cory A. Booker writing the B.O.P's
Director expressing 'serious concerns regarding the Bureau
of Prison's [] response to the ongoing outbreak at FCI Fort
Dix." <u>United States v. Tazewell</u>, No.07-Cr-1035(RMB), 2021
U.S. Dist. LEXIS 99, 2021 WL 21980, at *3 (S.D.N.Y., Jan 3,
2021)(quoting "Menendez, Booker, NJ Delegation Renew Call to

Halt Transfer to Fort Dix Amidst Continuing COVID-19
Outbreak," https://www.menendez.senate.gov)).

Such by no means is to say that an "inmate at any
prison where there <u>were</u> positive COVID-19 cases is entitled
to a finding of extraordinary and compelling circumstances"
the "operational failures at Fort Dix", however, "go well
beyond the facts shown in compassionate release motions the
court routinely sees." <u>United States v. Newell</u>, 2021 U.S.
Dist. LEXIS 143059, at *13 - 14 (M.D.N.C. July
30,2021)(internal citation omitted); but to demonstrate
instead that Weber's "risk of reinfection is increased by
the likelihood that the BOP will repeat in the future the
decisions that led to the outbreak[(s)]" to begin with. <u>id.</u>,
at *13.

Regardless of an absence of reported active COVID-19
cases at FCI Fort Dix at a given moment, accordingly, see
<u>United States v. Amarrah</u>, F.Supp. 3d 611, 618 (E.D.Mich.,
May 7, 2020)("Zero <u>confirmed</u> COVID-19 cases is <u>not</u> the same
as zero COVID-19 cases'...") Weber affirmatively proves his
presence at FCI Fort Dix poses him an unusually high-risk of
contracting COVID-19 over-and-over comprising extraordinary
and compelling circumstances coupled with his pre-existing
susceptibility to severe infection compared an inmate housed
at a substantially less crowded prison who is without COVID
risk factors, vaccination notwithstanding. see <u>United States
v. Miller</u>, 2022 U.S. Dist. LEXIS 207905, at *10 (E.D.Va.,
Nov 15, 2022)("FCI Fort Dix has historically struggled with

14

high rates of inmate infection [ ] and other court's have
repeatedly found that inmates housed in that complex
experience an increased exposure to the virus.").

[3]     VACCINATION-STATUS

Assuming Weber to be the most up-to-date with his
COVID-19 vaccination see i.e., United States v. Lester, 2022
U.S. Dist. LEXIS 26996, at *6 n.9 (S.D.W.Va., Feb 15,
2022)("It is the availability of the vaccine, not the fact
that an individual actually received it, that matters.");
this does not "eliminate concerns about underlying health
concerns that might otherwise render [him] eligible for
compassionate release." United States v. Boyd, 2022 U.S.
Dist. LEXIS 208710, at *35 (D.Md., Nov 16, 2022); see also
United States v. Johnson, 2021 U.S. Dist. LEXIS 231925, at
*13 (E.D.N.Y. Dec. 3, 2021)("Courts have continued to find
the risk of COVID-19 germane to their analysis of
extraordinary and compelling circumstances, even where, as
here, the defendant is vaccinated.").

Underscoring this point is that "[a]s game-changing as
the Pfizer vaccine (and Moderna's equally effective MRNA-
1273 vaccine) may be in affording protection against COVID-
19 illness, the results do not reflect complete 'sterilizing
immunity.'" James Myhre and Dennis Sifris, Sterilizing
Immunity and COVID-19 Vaccines (Dec. 24, 2020); hence,
unlike other "sterilizing vaccines" COVID-19 ones are
actually "non-sterilizing" by design and "do not kill the
underlying virus like some traditional vaccines (i.e., they

15

cannot clear and prevent and infection from taking hold),
and thus the vaccines for COVID-19 cannot affirmatively
preclude vaccinated persons from either contracting or
transmitting the SARS-CoV-2 virus." Halgren v. City of
Naperville, 577 F.Supp. 3d 700, 713 (7th Cir. Ill., Dec 19,
2021); see also Preventing "Silent Spread": Why Asymptomatic
Testing is Crucial During Vaccine Rollout, THERMOFISHER
(Apr. 19, 2021), available
https://www.thermofisher.com/blog/ask-a-
scientist/preventing-silent-spread-why-asymtomatic-testing-
is-crucial-during-vaccine-rollout ("Based on existing data,
it seems likely that the current COVID-19 vaccines confer
excellent effective immunity [from severe disease and
death], but do not provide complete sterilization immunity
against the SARS-CoV2 virus.").

    This is interesting to note and important here because
even though Weber's presumptive full vaccination does
protect against risk of sudden death from symptoms of a
COVID-19 infection - the virus is very much alive internally
and causes damage for otherwise non-susceptible people with
aggravating pre-existing conditions (such as those Weber
suffers); Weber, therefore, facing an elevated personal risk
of severe COVID-19 despite vaccination.

    Case-and-point concerning the internal damage infection
with COVID-19 inflicts: while the virus is new and there are
no long-term studies concerning its lasting impacts
"clinicians have seen evidence that the virus causes [1]

long-term lung scarring, [2] heart inflammation, [3] acute kidney disease, [4] neurological malfunction, [5] blood clots, [6] intestinal damage, and [7] liver problems." United States v. Fleming, 2020 U.S. Dist. LEXIS 255125, at *21-21 (C.D.Cal., June 24, 2020)(citing Lenny Bernstein, Coronavirus Destorys Lungs, But Doctors are Finding its Damage in Kidneys, Hearts and Elsewhere, WASH. POST (Apr. 15, 2020)).

Moreover, available science, preliminary evidence and historical research on other coronaviruses "like severe acute respiratory syndrome (SARS) and Middle East Respiratory Syndrome (MERS), suggests that for some people affected by COVID-19, a full recovery may not happen for years if at all..." with other studies indicating that "permanent lung damage can be found in anywhere from 77 to 95 percent of COVID-19 survivors." United States v. Halliburton, 2020 U.S. Dist. LEXIS 102241, at *12 (C.D.Ill., June 11, 2020)(citation omitted); see also Ruderman v. Kolitwenzew, 459 F.Supp. 3d 1123, 1125 (7th Cir. Ill., May 12, 2020)("the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and immune systems. This damage is so extensive and severe that it may be enduring. Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs...")(citing Tianbing Wang, et al., Comorbidities and multi-organ injuries in the treatment of COVID-19, 395

17

Lancet 10228 (2020)).

The precarious nature of Weber's numerous uncontrolled chronic conditions (that include heart failure among other serious cardiovascular diseases plus a rare blood cancer and obstructive lung disease) effectively nullify protection afforded by vaccination. While vaccination would eliminate symptoms arising from a COVID infection, to be sure, it will not circumvent the virus's impact internally on Weber's chronically diseased heart, blood/veins, and lungs.

Until development of a universal sterilizing COVID-19 vaccination (the likes of the measles/small pox vaccines) that actually kills the virus as opposed to merely 'silencing' physical symptoms - Weber (and people like him) face a continued elevated risk in spite of vaccination; Weber's [1] pre-existing conditions, age, obesity, and [2] incarceration in general but at FCI Fort Dix in particular altogether constitute "extraordinary and compelling" circumstances next to the forthcoming argument. see e.g., United States v. Parish, No.07-CR-00578-RMG, 2021 U.S. Dist. LEXIS 61684, 2021 WL 1152960, at *1-3 (D.S.C. Mar. 17, 2021)(granting compassionate release to a 63 year old partially vaccinated inmate who previously contracted and recovered from COVID-19, noting "[t]he combined effect of [his] significant array of cardiac, kidney, vascular, and other chronic conditions exacerbated by his advancing age...").

18

C.   WEBER'S RARE BLOOD CANCER DIAGNOSIS OVER
     EIGHTEEN MONTHS AGO THE B.O.P. HAS STILL
     NOT TREATED IS AN EXTRAORDINARY & COMPELLING
     REASON TO MODIFY HIS SENTENCE

There is currently "no relevant policy statement

defining the parameters or establishing a test for when

inadequate medical care is an extraordinary and compelling

reason by itself or in conjunction with other factors."

United States v Burr, 2022 U.S. Dist. LEXIS 216371, at *15

(M.D.N.C. Dec 1, 2022). As yet effective, however, providing

helpful guidance nonetheless - the forthcoming amended

U.S.S.G § 1B1.13 policy statement is salient - considering

"extraordinary and compelling" circumstances present when:

> The defendant is suffering from a medical condition
> that requires long-term or specialized medical care
> that is not being provided and without which the
> defendant is at risk of serious deterioration in
> health or death. see Sentencing Guidelines For United
> States Courts, 88 Fed. Reg. 7180, 7184 (Proposed Feb.
> 2, 2023)

This policy is not yet effective, again, but subject to

judicial notice see Magnoni v. Smith & Laquercia, 483

F.App'x 613, 616 (2d Cir.2021) and relevant here though non-

binding - providing a provisional framework to the same

extent the non-applicable post-FSA defunct policy statement

may be nonetheless employed. see United States v. Lisi, 440

F.Supp. 3d 246, 2020 U.S. Dist. LEXIS 31127, 2020 WL 881994,

at *3 (S.D.N.Y.2020).

Applied in the instant circumstances, accordingly, an

additional "extraordinary and compelling" circumstance is

definite. On January 24, 2022 during a Telemedicine

consultation Dr. Soffer noted under "Impressions" -
"Polycythemia, cause uncertain.  Suggesting in turn that
"[t]he prison medical staff should evaluate the polycythemia
and refer for hematology consultation". see Ex., C , These
findings acknowledged via cosign by Weber's B.O.P. Health
Services physician Dr. F. Ahmedi.

    At a subsequent Telemedicine consult on September 12,
2022, eight months later, Dr. Soffer noted last seeing Weber
in January and "[a]t that time, [] recommend[ing] a
hematology consultation for polycythemia. [And that] it has
not been done..."; re-iterating under 'Suggestions', again,
that "Prison medical staff should evaluate the polycythemia
and refer for hematology consultation." Ex. C  Nearing a
whole year since Dr. Soffer notes that no hematology consult
had been done Weber still has not been seen by hematology.

    Previously noted polycythemia is a "slow-growing blood
cancer" where bone marrow makes too many blood cells which
thickens blood, in turn, leading to complications such as
blood clots - themselves causing heart attack or stroke.
Appearances aside, "proper medical care can help ease signs,
symptoms of this disease" rendering it otherwise manageable
contingent of course on proper monitoring and timely
intervention; neither of which Weber is provided by the
B.O.P. see Polycythemia vera, at
https://www.mayoclinic.org/diseases-conditions/polycythemia-
vera/symptoms-causes/syc-20355850.

    At the current rate of eighteen months elapsed since

20

Weber's diagnosis without the hematologist consult any time
now could be when the condition hits critical mass.
Accounting for the obvious fact that "inmates with health
issues are at the BOP's mercy while incarcerated... and []
cannot independently schedule needed medical tests or care."
Burr, 2022 U.S. Dist. LEXIS 216371, at *19 the circumstances
at-bar qualify as "extraordinary and compelling" based on
the criteria. Weber suffers from polycythemia, as shown, a
"medical condition that requires long-term or specialized
medical care" via hematology consult (that will need to be
recurrent) which, as shown, "is not being provided and
without which the defendant is at risk of serious
deterioration in health or death." Sent. Guidelines For U.S.
Courts, 88 Fed. Reg. 7180, 7184 (Proposed Feb. 2, 2023).

Without even referring to the forthcoming amended §
1B1.13 policy statement, Courts have nonetheless found
nonetheless "where there is a strong showing that the BOP's
medical is inadequate, a sentence reduction may be
appropriate" explicitly finding that "lengthy and
unexplained delays of needed medical care can be
extraordinary and compelling circumstances and have granted
compassionate release motions." Burr, 2022 U.S. Dist. LEXIS
216371, at *19 (citing United States v. Beck, 425 F.Supp. 3d
573, 580-81 (M.D.N.C.2019)(finding that the BOP's "grossly
inadequate treatment" for invasive cancer was an
extraordinary and compelling reason to grant release.)) and
United States v. Almontes, No.5-CR-58, 2020 U.S. Dist. LEXIS

21

62524, 2020 WL 1812713, at *6-7, 9-10 (D.Conn. Apr. 9, 2020)(granting compassionate release because defendant, suffering from a severe spinal condition had not received urgently needed surgery for over two years); United States v. Robles, No.19-CR-4122, 2022 U.S. Dist. LEXIS 14554, 2022 WL 229362, at *2 (S.D.Cal. Jan. 26, 2022)(granting compassionate release to defendant suffering multiple medical conditions because defendant "ha[d] not received the consistent care, monitoring, and treatment required for her conditions, including much-needed heart surgery which had yet to even be scheduled.")).

And even if between this motions filing and the Courts of hearing of it - the B.O.P comes through at last after eighteen months; such cannot discount an extraordinary and compelling finding being that Weber's condition is incurable requiring "long-term" AND "specialized medical care" all the more necessary considering "in some cases[,] there's a risk of progressing to more-serious blood cancers, such as myelofibrosis or acute leukemia." see Polycythemia vera, Mayclinc.

At the current rate, indeed, the Court (nor Weber) cannot rest assured that even if seeing hematology in the immediate future - the B.O.P will do so with reasonable consistency for remainder of his sentence. see e.g., United States v. Lopez, 2023 U.S. Dist. LEXIS 28288, at *29 n.5 (N.D.Ill. Feb 13, 2023)("Court's have found extraordinary and compelling circumstances where a history of inadequate

22

or delayed medical care demonstrates that the defendant 'is

not likely to receive better treatment [from the BOP] going

forward.'")(quoting Beck, 425 F.Supp. 3d at 580-81).

D.    WEBER'S VERY SHORT REMAINING SENTENCE
      MODIFIED TO BE SERVED ON SUPERVISED
      RELEASE W/ SPECIAL CONDITIONS INCLUDING
      (BUT NOT LIMITED TO) HOME DETENTION
      IS 18 U.S.C. § 3553(a) COMPLIANT

Weber's September 19, 2025 release date is just around

the corner. And especially - considering both up to twelve

months halfway house and six months home confinement he

could receive under the Second Chance Act (Weber may also

apply FSA credit for early release to halfway house/home

confinement on top of any Second Chance Act placement) Ex. E

. Modifying Weber's sentence sparing his exposure to the

outlined 'extraordinary & compelling' circumstances supra

for this reason meets all § 3553(a) sentencing factors now

discussed.

Applying aforesaid factors, modifying Weber's sentence

to the extent requested will leave many such factors

inapplicable in the instant context. With so little time

left on his sentence. for one, and home detention while

"certainly a less severe punishment than prison" but

"punishment nonetheless,"; United States v. Washington, 2021

U.S. Dist. LEXIS 379, at *4 (S.D.N.Y. Jan 4, 2021); needs

for Weber's modified sentence to reflect (1) Seriousness of

the offense; (2) promote respect for the law, and (3) afford

adequate deterrence all remain embodied in a modified

sentence permitting remainder of which be served non-

23

custodially. see e.g., <u>United States v. Levy</u>, No.16-CR 270,
2020 U.S. Dist. LEXIS 83544, 2020 WL 2393837, at *7
(E.D.N.Y. May 12, 2020)(noting that forcing the defendant to
serve out the small remainder of his term in pandemic
conditions "would be to require a sentence that is greater
than necessary to achieve the purposes of sentencing."); see
also <u>United States v. McNish</u>, 2020 U.S. Dist. LEXIS 173048,
at *10 (E.D.Pa., Sept. 22, 2020)("When a defendant is
already due to be released from prison in a short time, the
efficacy of the Court's ability to protect the public from
further crimes of the defendant by denying compassionate
release are significantly tempered.").

Of those §3553(a) factors applicable nonetheless, the Court
views anew Weber's (1) history and characteristics and the
need(s) for his sentence to (2) provide Just Punishment for
the offense, and (3) provide him with needed medical care
effectively. see e.g., <u>United States v. Johnson</u>, 2020 U.S.
Dist. LEXIS 186834, at *19 (D.Kan. Oct. 8,2020)("So,
recognizing various developments since the Court sentenced
[Defendant], the Court considers certain § 3553(a) factors,
as applied to him, slightly differently today than it once
did.")(citation omitted).

Weber's History & Characsteristics
§ 3553(a)(1)

Suffice it to say, Weber's extraordinary and compelling
circumstances detailed previously incorporate themselves as
well into his "history & characteristics" relevant to
consideration of the instant motion, of course. see i.e.,

24

Beck, 2021 U.S. Dist. LEXIS 13689, at *4 (finding "Decisions about whether a particular defendant's sentencing factors support release are made in light of his specific extraordinary and compelling reasons, not separate from those reasons."). In addition to these, as such, the following sets forth the "most up-to-date picture" of Weber's history and characteristics including evidence of rehabilitation. Pepper v. United States, 562 U.S. 476, (2011).

Weber has served over 63% of his ten-year sentence to date during which time he as remained gainfully employed. Prior to sentencing even, while at MCC Manhattan New York Weber worked as a Trustfund TRULINCS orderly responsible for cleaning and maintenance of inmate computer terminals and phones on top of also serving as an Inmate Companion for eighteen months there, responsibilities entailing monitoring inmates on Suicide Watch - logging their behavior (everything they say/do) every 15 minutes over four hour shifts.

Since arriving to FCI Fort Dix in August of 2019, additionally, Weber has been involved as a Hospital Companion - charged with accompanying visually impaired inmates assigned by Health Services to Food Service, Commissary, Laundry, and so forth - a position he holds presently. Ex. F

Aside from a single Incident Report received in May of 2020 arising from allowing another inmate to place phone

calls utilizing his own assigned "Personal Access Code
(PAC); Weber has received no other disciplinary action.
Learning from not only that incident but from sentencing and
incarceration, overall: (1) heeding his first instinct
before becoming involved in a situation, and; (2) the need
for him to rely less on his emotions, but more on logic when
making decisions.

Weber maintains close family ties with his sister and
mother with whom he has arrangements of residing with at
████████████████████████ ██████████████████ ██████████ In
light of the instant offense Weber is unable to resume
employment in the Education sector where he had been
employed by two agencies as a Home Instruction Tutor.
Nevertheless, Weber intends on applying for full-time
employment with the likes of Lowes, Home Depot, ACE
Hardware.

With no prior criminal record, a solid employment
history pre-dating incarceration, and a solid release plan
that includes unwavering support from family members -
Weber's history and characteristics demonstrate him to be
one highly motivated to succeed upon re-entry; recognizing
the error of his ways, and assuredly unlikely to recidivate
as corroborated both by a Minimum (-6) FSA PATTERN
Recidivism Risk Score see Ex. G , and strong support system.
see i.e., United States v. Parker, 461 F.Supp. 3d 966, 983
(C.D.Cal.2020)(granting weight to defendant's "numerous
family ties, including family members who will provide for

26

him" (citation omitted)); see also United States v. Ladson,
2020 U.S. Dist. LEXIS 108551, 2020 WL 3412574, at * 8-10
(E.D.Pa. June 22, 2020)(concluding defendant's strong family
ties and stable home weighed against finding defendant a
danger to the community); United States v. Wen, No. 17-CR-
6173, 454 F.Supp. 3d 187, 2020 U.S. Dist; LEXIS 64395, 2020
WL 1845104, at *8 (W.D.N.Y. Apr. 13, 2020)(counting in
defendant's favor his "supportive family with whom he will
reside once released").

Just Punishment For The Offense
§ 3553(a)(2)(A)

It goes without saying the COVID-19 pandemic has
altered the sentencing "sufficient but not greater than
necessary" concept. The Court, sentencing Weber on May 28,
2019 could by no means have foreseen service of its'
sentence as it now includes "incurring a great and
unforeseen risk of severe illness or death.'" nor could it
have foreseen his polycythemia diagnosis and the B.O.P's
troubling inattention to which. United States v. Gray, 2020
U.S. Dist. LEXIS 161973 (W.D.Pa. Sept 4, 2020).

That it does, of course, increases punitive effect of
the sentence beyond the Courts intent such that "aside from
posing a threat to [Weber's] health, has made [his]
incarceration harsher and more punitive than would otherwise
have been the case." United States v. Rodriguez, 492 F.Supp.
3d 306, 311 (S.D.N.Y. Sept. 30, 2020); see also United
States v. Lizardi, No.11 Cr. 1032 (PAE), Dkt. 2532 at 7,
2020 U.S. Dist. LEXIS 188147 (S.D.N.Y. Oct. 9, 2020)("A day

27

spent in prison under extreme lockdown and legitimate fear
of contracting a once-in-a-century deadly virus exacts a
price on a prisoner beyond that imposed by an ordinary day
in prison" and "[w]hile such conditions are not intended as
punishment, incarceration in such circumstances is,
unavoidably, experienced as more punishing."); United States
v. Mel, 2020 U.S. Dist. LEXIS 74491 (D.Md., Apr 28,
2020)(noting "the actual severity of the sentence as a
result of the COVID-19 outbreak exceeds what the court
anticipated at the time of sentencing.").

    With these considerations in mind and so little time
left "[t]he benefits of keeping [Weber] in prison for the
remainder of his sentence are extraordinarily grave." United
States v. Perez, 451 F.Supp 3d 288, 294 (S.D.N.Y.2020) based
on more than COVID-19 alone, but unchecked progression of
his polycythemia diagnosis considering the B.O.P's inaction.
And, again, to whatever extent it may be found at a given
moment no reported cases at the institution, "that the virus
is [only apparently] now under control does not guarantee it
will be contained in the future." not to mention (as
previously discussed) Fort Dix inherently increasing
likelihood of contracting the virus to begin with. United
States v. Johnson, 2021 U.S. Dist. LEXIS 231925, at *11
(E.D.N.Y. Dec 3, 2021); see also Amarrah, 458 F.Supp. 3d at
618 ("Zero confirmed cases is not the same thing as zero
COVID-19 cases... The disease spreads asymptomatically,
which means the court and the prison can take no comfort in

a lack of confirmed cases...").

And, while the 'Just Punishment' concept certainly does implicate societal interests "in seeing that the offender is paid for the hurt he caused" Kennedy v. Louisiana, 544 U.S. 407, 442 (2008) to this end, this need is a double-edged sword "cut[ting] both ways," also requiring the punishment be fair from Weber's perspective - not allowing his imprisonment "to become a sentence of death" in other words; this factor § 3553(a)(2)(A) assessed anew accordingly supports turning the remainder of his custodial sentence into one he can serve safely. United States v. Garcia, 2021 U.S. Dist. LEXIS 159654, 2020 WL 5237272, at *6 n.2 (E.D.Pa. Sept. 1 ,2020)(while § 3553(a) factors may have supported a Petitioner's sentence, "the significant change of circumstances created by COVID-19 warrants a closer look at the purposes for [Petitioner's] punishment balanced with the risk he faces due to his medical condition[s] and [ongoing] exposure to COVID-19.").

Needed Medical Care
§ 3553(a)(2)(D)

The hematology consult Weber has yet to have is not the only medical care he needs that a modified sentence would allow his access to. Next to the polycythemia diagnosis the B.O.P. also fails to address Weber's "right inguinal hernia" he was found to have during an Emergency Room trip on January 27, 2022 see Ex., C. Eighteen months later and neither the repair, nor the cardiac clearance required to precede which have been done in spite of a General Surgery

consult on August 5, 2022 recommending repair.

And besides Weber's untreated polycythemia diagnosis and un-repaired hernia is his existing chronic care conditions the B.O.P inadequately treats and monitors. In spite of his diagnosis with heart failure, coronary artery disease, and hypertension for instance - medical records will reflect Weber undergoing but a single Echocardiogram since at FCI Fort Dix.

The institution not only fails to provide the quarterly Echocardiograms required to monitor his heart condition(s), the records also reflect an absence of consistent blood pressure readings - the ease of such a procedure he requires but the prison fails providing quite telling. What's more is the B.O.P's outright denial of medication recommendations per Dr. Soffer submitted by his providers. see <u>Ex. C</u> . It comes as no surprise then that just about every occasion Weber does manage to be seen by cardiology via Telemedicine that his blood pressure as well as cholesterol/triglycerides are practically never on target otherwise increasing his heart attack/stroke risks.

All things considered, the B.O.P's demonstrated inability at effectively managing Weber's numerous health issues support a sentence modification allowing for his remaining term to be served non-custodially thus enabling his access to the appropriate specialists, monitoring, and treatment in accordance with this particular sentencing factor. see <u>United States v. Gluzman</u>, No. 96-CR-323(LJL),

2020 U.S. Dist. LEXIS 131749, 2020 WL 423049, at *18-19
(S.D.N.Y. July 23, 2020)(granting a motion for compassionate
release in part based on the "need... to provide the
defendant with needed... medical care... in the most
effective manner"); see also United States v. Garcia, 505
F.Supp. 2d 328, No. 11 Cr. 989(JSR), 2020 Dist. LEXIS
230236, 2020 WL 7212962, at * (S.D.N.Y. Dec. 8, 2020)("The
Court plainly must consider the risk that [Defendant] could
grow [more] ill or die in custody when assessing the 'kinds
of sentences available,' and whether the sentence reflects
'just punishment' and whether the sentence will provide
[Defendant] with needed medical care, training, and other
correctional treatment.").

### C O N C L U S I O N

In light of the foregoing, Defendant Weber hereby and
respectfully moves the Court for modification of the
original 120 month judgment to the extent outlined herein.

On the ___8TH___ day of ___August___, 2023.

Jeffrey Weber, Pro se
Reg No. 85377-054
F.C.I. Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

# EXHIBITS

UNITED STATES V. JEFFREY WEBER

Case No. 18-CR-641

\* \* \* Table of Exhibits \* \* \*

### EXHIBIT A

Sentence Computation Data

### EXHIBIT B

Compassionate Release/Reduction In Sentence Form
Warden-Addressed Electronic Request to Staff

### EXHIBIT C

Selected Bureau Electronic Medical Records

### EXHIBIT D

Declaration of Joe Goldenson, MD

### EXHIBIT E

FSA Time Credit Assessment

### EXHIBIT F

Individualized Needs Plan
Inmate Education Data Transcript

### EXHIBIT G

FSA Recidivism Risk Assessment (PATTERN)

\* \* \* End of Exhibits \* \* \*

## Declaration of Joe Goldenson, MD

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility and the planning and coordination of the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and am past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3. For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert and monitor at Cook County Jail in Chicago; Los Angeles County Jail; at other jails in Washington state, Texas, and Florida; and at prisons in Illinois, Ohio, and Wisconsin.

5. My curriculum vitae is attached as exhibit A.

## The nature of COVID-19

6. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the World Health Organization ("WHO"). Cases first began appearing between December 1 and December 31, 2019, in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

7. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus that caused the 2002–2003 SARS epidemic.



EXHIBIT

D.

8. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.1 to 3.5%, which is up to 35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

9. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardiovascular disease, respiratory disease, diabetes, and immune compromise.

10. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS), which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and in parts of China.

11. COVID-19 is widespread. Since it first appeared in China in late 2019, outbreaks have subsequently occurred in more than 160 countries and all populated continents; heavily affected countries include Italy, Spain, Iran, South Korea, and the U.S. The U.S. is now the world's most affected country. As of April 29, 2020, there have been 3,142,942 confirmed human cases globally and 218,564 known deaths.[1] It is not contained, and cases are growing exponentially.

12. In the United States alone, the Centers for Disease Control and Prevention ("CDC") reports 981,246 cases and 55,258 deaths as of April 28.[2] The New Jersey Department of Health reports 113,856 cases and 6,442 dead as of April 28.[3] All these numbers are likely underestimates because of limited availability of testing.

13. SARS-nCoV-2 is now known to be fully adapted to human-to-human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

14. The U.S. CDC estimates that the reproduction rate of the virus, the R0, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again is

[1] https://coronavirus.jhu.edu/map.html (last accessed April 29, 2020)
[2] https://www.cdc.gov/covid-data-tracker/index.html ((last accessed April 29, 2020)
[3] https://covid19.nj.gov/#live-updates ((last accessed April 29, 2020)

likely a function of all human populations currently being highly susceptible. The attack
rate given an exposure is also high, estimated at 20–30% depending on community
conditions, but may be as high as 80% in some settings and populations. The incubation
period is thought to be 2–14 days, which is why isolation is generally limited to 14 days.

15. CDC has recently added to the list of possible signs and symptoms of COVID-19 to
include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking
with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[4] This means
the questionnaires currently used to screen staff and prisoners need to be updated and the
numbers of suspect cases will increase.

16. There is currently no vaccine for COVID-19, and no cure. The only known ways to
prevent the spread of SARS-nCoV-2 involve measures such as thorough handwashing,
frequent decontamination of surfaces, and maintaining six feet of physical distance
between individuals ("social distancing").

**The risks of COVID-19 in detention facilities**

17. COVID-19 poses a serious risk to prisoners, workers, and anyone else in detention
facilities. Detention facilities, including prisons like Fort Dix, have long been associated
with high transmission probabilities for infectious diseases, including tuberculosis, multi-
drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

18. The severe epidemic of tuberculosis in prisons in Central Asia and Eastern Europe was
demonstrated to increase *community* rates of tuberculosis in multiple states in that region,
underscoring the risks prison outbreaks can lead to for the communities surrounding a
prison.

19. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus,
are particularly difficult to control in detention facilities, as social distancing and proper
decontamination of surfaces are virtually impossible.

20. For example, several deaths were reported in the U.S. in immigration detention facilities
associated with ARDS following influenza A, including a 16-year old male immigrant
child who died of untreated ARDS in custody in May 2019.

21. Current recommendations for social distancing, frequent hand washing, and frequent
cleansing of surfaces to prevent infection and the spread of the virus are extremely
difficult, if not impossible, to implement in the correctional setting. A number of features
of these facilities can heighten risks for exposure, acquisition, transmission, and clinical

---

[4] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-
ncov/symptoms-testing/symptoms.html

complications of these infectious diseases. These include physical/mechanical risks such as overcrowding; population density in close confinement; insufficient ventilation; shared toilet, shower, and eating environments; and limits on hygiene and personal protective equipment such as masks and gloves in some facilities. Shared spaces and equipment (such as telephones) are commonly not adequately disinfected, especially during the current pandemic when more frequent cleaning and disinfecting are required. Limits on soap (copays are common) and hand sanitizer, since they can contain alcohol, are also risks for spread. The nationwide shortage of personal protective equipment (PPE), as well as ancillary products (such as cleaning supplies and thermometer probes) further impacts the ability of correctional facilities to implement necessary precautions.[5]

22. The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community.

23. Close, poorly ventilated living quarters and often overcrowded conditions in these facilities foster the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing, speaking, or coughing. In these congregate settings, large numbers of people are closely confined and forced to share living spaces, bathrooms, eating areas, and other enclosed spaces.  Groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria. Persons congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. They are physically unable to practice social distancing, which the CDC has identified as the "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[6]

24. This forced congregation spreads infection from one area of a prison to other areas, too. In addition, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility. Officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the

---

[5] *Study of COVID-19 in Correctional Facilities*, Harvard University and National Commission on Correctional Health Care, April 9, 2020

[6] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

facility and transmission to and from detainees in different parts of the facility. This regular circulation makes the spread of infection throughout a prison all but inevitable.

25. While jails, prisons, and detention centers are often thought of as closed environments, this is not the case. Custody, medical, and other support staff and contractors enter and leave the facility throughout the day. New detainees arrive on a frequent basis. Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to those housed in the facility. Detainees and inmates are often transferred between housing units, to other facilities, and to and from court. This further increases the likelihood of transmission of COVID-19.

26. It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission. Due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home to their families and communities.

27. In addition to the nature of the prison environment, prison and jail populations are also at additional risk due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to death or severe illnesses after infection from COVID-19 disease.

28. Testing kits are widely unavailable, and it can take anywhere from a day to a week or more to obtain test results. Someone who is tested shortly after he or she was infected may test negative. Non-test-based screens like taking people's temperatures or asking them for subjective reports of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[7] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic, and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission.

29. While every effort should be made to reduce exposure in detention facilities through internal mitigation efforts, this may be extremely difficult to achieve and sustain quickly

---

[7] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

enough. Further, no mitigation effort can change the inherent nature of detention facilities, which force people to live in close proximity to one another. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible. Indeed, that is the only public health solution available at this time to reduce the spread of COVID-19 and potentially save lives.

30. Given the experience in China as well as the literature on infectious diseases in jail, additional outbreaks of COVID-19 among the U.S. jail and prison populations are highly likely. Releasing as many inmates as possible is important to protect the health of inmates, correctional facility staff, health care workers at jails and other detention facilities, and the community as a whole. Indeed, according to the WHO, "enhanced consideration should be given to resorting to non-custodial measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages."[8]

31. For these reasons, the pandemic has prompted prisoner releases around the world. France has freed 5,000 inmates[9], and, in the United States, California officials are planning to release up to thousands of prisoners.[10] In Britain, the Ministry of Justice is planning to grant thousands of prisoners early release within weeks in an effort to contain the spread of the virus in cells and facilities where it said social distancing rules are impossible to maintain.[11] Many cities and counties across the US, including San Francisco, Los Angeles, Chicago, Cleveland and New York, are also releasing prisoners to reduce the risk of COVID-19.[12]

32. It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as FCI Fort Dix. At Rikers Island jail in New York, between April 1 and April 15, 2020, the number of COVID-19 positive incarcerated individuals and staff members grew by 104 and 114 people, respectively, upping the jail's total numbers of confirmed cases to 288 among the incarcerated population, 488 among

---

[8] World Health Organization, Regional Office for Europe, Preparedness, prevention and control of COVID-19 in prisons and other places of detention: Interim guidance (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

[9] *Coronavirus: Low-risk prisoners set for early release*, BBC News (Apr. 4, 2020), https://www.bbc.com/news/uk-52165919.

[10] Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, L.A. Times (Mar. 31, 2020), https://www.latimes.com/california/story/2020-03-31/coronaviruscalifornia-release-3500-inmates-prisons.

[11] *Britain plans to free many inmates early as it reports a on-day death toll*, New York Times, 4/3/20.

[12] Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirusprisons-jails.html.

correction staff, and 78 among health care workers.[13,14] The first known case of COVID-19 at Rikers was confirmed on March 18,[15] illustrating just how quickly this disease can and will overwhelm detention facilities. Two Ohio prisons, Marion Correctional Institution and Pickaway Correctional Institution, have emerged as the largest-known sources of U.S. coronavirus infections, according to data compiled by The New York Times. To date 3,808 cases have been connected to the two prisons.[16] Over 80% of the approximately 2,500 prisoners in Marion tested positive.[17] In addition, 169 staff have tested positive for COVID-19.[18] Eight of the ten largest-known infections sources in the U.S. are jails or prisons.

33. At Ohio's Marion Correctional, close to 95% of those who tested positive were asymptomatic and would otherwise not have been tested.[19] This underscores the risk of the spread of COVID-19 by asymptomatic individuals.

34. According to the Bureau of Prisons, 27 detainees and 3 staff members at FCI Fort Dix currently have tested positive for COVID-19. Dozens more have symptoms. Even these dozens may represent the tip of the iceberg, since newly-infected people typically do not show symptoms for 2–14 days, many infected individual are asymptomatic, and since the infection spreads rapidly to additional people. While no detainees are reported to have died from COVID-19 in FCI Fort Dix yet, the death toll is likely to mount rapidly given the way the disease has progressed elsewhere.

35. It is my understanding that FCI Fort Dix has two open bay / dormitory housing units; at least seven housing units with 2-, 10-, and 12-man dormitory-style rooms; and a segregation unit. It also my understanding that FCI Fort Dix has roughly 2,900 detainees in the facility on any given day; that staff enter and leave the facility regularly; and that detainees share restroom and shower facilities and eat communally prepared food.

36. Based on these understandings, it is my opinion that the exponential infection of rate for COVID-19 we already see in the community would be magnified within FCI Fort Dix.

---

[13] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020), https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.

[14] Jan Ranson, *Jailed on a Minor Parole Violation, He Caught the Virus and Died*, N.Y. Times (Apr. 10, 2020)

[15] *As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000* (Mar. 18, 2020), N.Y. Times, https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.

[16] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage&action=click&module=Spotlight&pgtype=Homepage#states (last accessed April 29, 2020).

[17] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing Updated 4/28/2020, https://coronavirus.ohio.gov/static/DRCCOVID-19Information.pdf.

[18] *Id.*

[19] https://www.nytimes.com/reuters/2020/04/25/us/25reuters-health-coronavirus-prisons-testing-insight.html?searchResultPosition=8

Adequate social distancing would be impossible to achieve. What's more, the infection in FCI Fort Dix would not stay limited to the facility, but would worsen infection rates in the broader community. The infection rate will increase substantially before it starts to diminish without major interventions. The number at risk for death is substantial. This is why leaving implementation in the hands of local officials alone, who lack the expertise and resources and were incapable of preventing the outbreak in the first place, is insufficient.

**Conclusions**

37. For the reasons above, it is my professional opinion that persons currently detained at FCI Fort Dix are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities. If infected, many are at increased risk of suffering severe complications and outcomes.

38. It is my professional opinion that conditions in FCI Fort Dix threaten the health and safety of every individual within the prison—detained persons and staff alike—and in their surrounding communities.

39. It is my professional opinion that a necessary component of bringing FCI Fort Dix into compliance with the recommendations of the CDC to minimize the risk of COVID-19 transmission within the facility and to the larger community is to substantially reduce the population. Doing so will allow the facility to significantly reduce the risk of infection for both incarcerated people and correctional officers, which in turn protects the communities where corrections staff live.

40. It is my professional opinion that those who are medically vulnerable[20] need to be moved out of FCI Fort Dix to the absolute maximum extent possible. In addition, the overall population needs to be significantly lowered to reduce the density in the jails to allow for adequate social distancing, minimize the strain on the jail's medical care system, ensure adequate space is available for necessary quarantining.

---

[20] Persons held at Fort Dix over the age of 50, as well as all current and future persons held at Fort Dix of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease, or other chronic conditions associated with impaired heart function; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.

41. It is my public health recommendation that a public health expert be appointed to oversee operations related to preventing further spread of COVID-19 in FCI Fort Dix, which may include authorizing further staggered release of detainees until it is possible to maintain consistent social distancing and appropriate hygiene within the facility.

**Dr. Turner-Foster's declaration indicates deficient attempts to ensure social distancing and therefore my professional opinions and recommendations have not changed.**

42. On May 18, the government filed a brief in support of a motion to dismiss and in opposition to the petitioners' motion for a preliminary injunction. Attached to this brief was the declaration of Dr. Nicoletta Turner-Foster, Clinical Director at FCI Fort Dix. I have reviewed this declaration.

43. Dr. Turner-Foster's declaration indicates that Fort Dix has taken certain steps to educate prisoners and staff; screen prisoners, staff, and contractors entering the prison; and reduce the spread of COVID-19 within the prison. However the fundamental problem remains that prisoners cannot effectively social distance. My professional opinion remains that the prison is not doing what is reasonably necessary to prevent further spread of COVID-19 infection.

44. Although Dr. Turner-Foster states that various steps have been taken, these steps are described too vaguely to determine their effectiveness. For example, she describes a Bureau of Prisons policy whereby newly arriving asymptomatic inmates with reported risk of exposure are placed in quarantine, and she states that at Fort Dix new prisoners are put into an automatic 14-day quarantine only for those inmates. But Dr. Turner-Foster does not indicate whether inmates who enter the prison on different dates are all quarantined together. It is necessary to maintain separate quarantine groups based on date of entry or exposure to prevent cohort cross-exposure. Dr. Turner-Foster's description does not indicate whether that is being done.

45. Similarly, Dr. Turner-Foster describes the prison's practice for screening staff members of taking their temperatures and administering a medical questionnaire. But requiring staff members to take a questionnaire would not be adequate if staff members are not being asked about specific COVID-19 symptoms. This is particularly important because throughout March and April the public were told of only three symptoms (fever, cough, and shortness of breath), but in late April the CDC substantially expanded the list of symptoms to add chills, muscle pain, sore throat, and new loss of taste or smell. The CDC also notes that other reported symptoms include nausea, vomiting, and diarrhea. Awareness of COVID-19's symptoms cannot be assumed, so administering a questionnaire is adequate only if it covers the specific symptoms.

46. Dr. Turner-Foster indicates that the prison is using two floors of a housing building to serve as a quarantine unit for prisoners who have tested positive and have symptoms (on one floor) and who are recovering (on another floor). Separating infected inmates is a necessary step but is not sufficient on its own. The quarantine unit would need adequate staffing, equipment, and resources, and Dr. Turner-Foster's declaration fails to provide that essential information.

47. Most concerningly, Dr. Thomas-Foster describes efforts to promote social distancing but does not give any details necessary to assess whether effective social distancing is occurring. She states that Health Services appointments are limited to 20 inmates at a time so that inmates can socially distance, that prisoners are encouraged to maintain social distancing, that prisoners who tested positive were moved to another building to assist in social distancing, and that the current camp population of 124 inmates provides sufficient space for social distancing. But she provides no information about the size of the different spaces or the social distance that prisoners actually are able to maintain within them. Without the concrete information absent from her declaration, it is impossible to independently assess whether the prison's efforts are adequate.

48. The lack of necessary detail in Dr. Thomas-Foster's report reinforces my original recommendation for the appointment of a public health expert to review COVID-19-related operations at Fort Dix. Allowing an expert to examine conditions at the prison firsthand is the most efficient and effective way to determine whether the steps it is taking are reasonable.

49. Dr. Thomas-Foster states that the prison does not plan to consolidate medically vulnerable inmates and that it is safer to spread them out across the prison. I disagree with her view. Housing medically vulnerable inmates together would be safer because the inmates' overall health and COVID-19 symptoms could be monitored more easily, access in and out of the housing unit could be controlled more effectively, and staff could be designated for that unit in order to reduce the number of sources of potential infection. For these reasons, consolidating at-risk prisoners is safer.

50. Another specific concern that emerges from Dr. Thomas-Foster's declaration is the prison's reliance on the Abbott rapid testing machine to determine which prisoners are infected. The Food and Drug Administration has issued an alert about the accuracy of the the Abbott test.[21] The FDA issued this alert due to scientific studies casting doubt on the reliability of negative test results, and it warned that negative results from the Abbott machine may need to be confirmed. One study found that 15 to 20 out of 100 tests

---

[21] *See Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test* (May 14, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-informs-public-about-possible-accuracy-concerns-abbott-id-now-point.

produce false negative results, while another reported that it could be missing as many as 48% of infections.[22] Dr. Thomas-Foster's declaration makes no mention of the FDA's alert or the studies which led to it. Worse, she indicates that the prison is relying on negative results from the Abbott machine to decide when to house inmates together, without social distancing. Fort Dix's reliance on unreliable test results creates a clear danger of spreading infection.

51. I am informed by counsel for the petitioners of reports that a staff member who scanned in each prisoner at mealtimes in one of the compounds of the main facility has tested positive for COVID-19. If that report is accurate, it would mean that all of the prisoners in that compound were likely exposed to infection. Any prisoners who were exposed to a person who tested positive should, at a minimum, be quarantined with social distancing. This would be true even if the staff member wore a mask and did not touch the prisoners. Dr. Thomas-Foster's declaration does not mention this report, and indeed does not mention any of the Fort Dix staff members who BOP has reported testing positive. Her silence about any steps taken to prevent the spread of infection from staff members who tested positive reinforces my conclusion that the prison is failing to take necessary steps to protect inmates.

52. Accordingly, Dr. Thomas's declaration does not change my professional opinions. In fact, given the 21-day period between my original declaration and this one, the continuing spread of COVID-19 in federal prisons, and the continuing failure to implement social distancing at Fort Dix, I believe the urgency of taking effective action has increased even more.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May, 2020, in Alameda County, California.

Joe Goldenson, MD

---

[22] *See* Joe Neel & Hannah Hagemann, *FDA Cautions About Accuracy of Widely Used Abbot Coronavirus Test*, NPR (May 14, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/14/856531970/fda-cautions-about-accuracy-of-widely-used-abbott-coronavirus-test.

References

1.  Dolan K, Wirtz A, Maazen B., et al. Global Burdern of HIV, viral hepatitis, and tuberculosis in prisoners and detainees. *The Lancet,* July 14, 2016.

2.  Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

3.  Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No

    abstract available. PMID: 27427447.

4.  Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

5.  Nakamoto Group, Prison Rape Elimination Act Audit Report of FCI Fort Dix (2017), https://www.bop.gov/locations/institutions/ftd/PREA_final_report_ftd.pdf.

6.  Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

7.  Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151.

    FCI Fort Dix Admissions & Orientation Handbook, https://www.bop.gov/locations/institutions/ftd/FTD_aohandbook.pdf.

## FSA Time Credit Assessment

Register Number:85377-054, Last Name:WEBER

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number....: 85377-054 | Responsible Facility: FTD |
| Inmate Name | Assessment Date.....: 05-28-2023 |
|   Last.............: WEBER | Period Start/Stop...: 08-27-2019 to 05-28-2023 |
|   First............: JEFFREY | Accrued Pgm Days....: 1370 |
|   Middle...........: | Disallowed Pgm Days.: 0 |
|   Suffix...........: | FTC Towards RRC/HC..: 280 |
| Gender.............: MALE | FTC Towards Release.: 365 |
| Start Incarceration: 05-28-2019 | Apply FTC to Release: Yes |

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 08-27-2019 | 03-22-2020 | accrue | 208 |

Accrued Pgm Days...: 208
Carry Over Pgm Days: 0
Time Credit Factor.: 10
Time Credits.......: 60

----------------------------------------------------------------------

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 03-22-2020 | 05-28-2023 | accrue | 1162 |

Accrued Pgm Days...: 1162
Carry Over Pgm Days: 28
Time Credit Factor.: 15
Time Credits.......: 585

--- FSA Assessment ----------------------------------------------------

| # | Start | Stop | Status | Risk Assignment | Risk Asn Start | Factor |
|---|---|---|---|---|---|---|
| 001 | 08-27-2019 | 09-24-2019 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 10 |
| 002 | 09-24-2019 | 03-22-2020 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 10 |
| 003 | 03-22-2020 | 09-18-2020 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 15 |
| 004 | 09-18-2020 | 03-17-2021 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 15 |
| 005 | 03-17-2021 | 09-13-2021 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 15 |
| 006 | 09-13-2021 | 03-12-2022 | ACTUAL | FSA R-MIN | 04-28-2021 1359 | 15 |
| 007 | 03-12-2022 | 09-08-2022 | ACTUAL | FSA R-MIN | 01-11-2022 0149 | 15 |
| 008 | 09-08-2022 | 03-07-2023 | ACTUAL | FSA R-MIN | 06-29-2022 1720 | 15 |
| 009 | 03-07-2023 | 09-03-2023 | ACTUAL | FSA R-MIN | 12-09-2022 1029 | 15 |




EXHIBIT E.

### FSA Recidivism Risk Assessment (PATTERN 01.02.01)

Register Number:85377-054, Last Name:WEBER

**U.S. DEPARTMENT OF JUSTICE**　　　　　　　　　　　**FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 85377-054 | Risk Level Inmate....: R-MIN |
| Inmate Name | General Level......: R-MIN (-6) |
| Last.........: WEBER | Violent Level......: R-MIN (0) |
| First........: JEFFREY | Security Level Inmate: LOW |
| Middle.......: | Security Level Facl..: LOW |
| Suffix.......: | Responsible Facility.: FTD |
| Gender.........: MALE | Start Incarceration..: 05/28/2019 |

**PATTERN Worksheet Summary**

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 62 | 0 | 0 |
| Walsh w/Conviction | TRUE | 1 | 0 |
| Violent Offense (PATTERN) | FALSE | 0 | 0 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -4 | -2 |
| Drug Program Status | NoNeed | -9 | -3 |
| All Incident Reports (120 Months) | 1 | 1 | 1 |
| Serious Incident Reports (120 Months) | 1 | 2 | 2 |
| Time Since Last Incident Report | 11 | 2 | 1 |
| Time Since Last Serious Incident Report | 11 | 1 | 1 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 0 | 0 | 0 |
| Work Programs | 0 | 0 | 0 |
| | Total | -6 | 0 |



EXHIBIT

G.

\* \* \* END OF EXHIBITS \* \* \*

## Certificate of Service

I, Jeffrey Weber, certify that notification of the foregoing "MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A) AND MEMORANDUM IN SUPPORT" (with Exhibits) filing and availability via Electronic Court Filing system (in lieu of paper-copy) was provided to:

United States Attorney's Office
Southern District of New York
One St. Andrew Plaza
New York, New York 10007
On the ___8TH___ day of ___August___ , 2023

Jeffrey Weber, Pro se
F.C.I. Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640-0902